UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11130-RGS

FRESENIUS MEDICAL CARE HOLDINGS, INC.

v.

PADDOCK LABORATORIES, INC.

consolidated with

CIVIL ACTION NO. 10-111429-RGS

FRESENIUS MEDICAL CARE HOLDINGS, INC.

v.

AMNEAL PHARMACEUTICALS, LLC

MEMORANDUM AND ORDER ON
CLAIM CONSTRUCTION

October 6, 2010

STEARNS, D.J.

The two patents-in-suit are directed to medicinal capsules that are used to treat patients with chronic renal failure. The first patent, U.S. Patent No. 6,576,665 (filed Apr. 3, 2001) ('665 patent), entitled "Encapsulated calcium acetate caplet and a method for inhibiting gastrointestinal phosphorous absorption," was issued on June 10, 2003. The second patent in suit, U.S. Patent No. 6,875,445 (filed Oct. 24, 2002) ('445 patent), shares the identical title with the '665 patent and was issued on April 5, 2005. Before the court are the parties' briefs on claim construction. The court heard argument on claim construction on September 15, 2010.

BACKGROUND OF THE INVENTION

A common problem confronting patients with chronic renal failure is the development of hyperphosphatemia, an excess of phosphate in the bloodstream. '665 patent, Col. 1, ll. 29-30. Hyperphosphatemia frequently leads to additional complications such as secondary hyperparathyroidism and osteodystrophy. Id., Col. 1., ll. 31-32. Patients who develop these symptoms are typically treated with phosphate binders to reduce the absorption of phosphates from the gastrointestinal tract into the bloodstream.[1] When administered orally, calcium acetate is the most effective calcium-containing phosphate binder able to contain hyperphosphatemia. Id., Col. 1, ll. 51-54.

Prior iterations of calcium acetate tablets or capsules were less than ideal for end stage renal disease patients because they were bulky in size and difficult to swallow. In addition, the unpleasant chalky taste was difficult to mask. As a result, patients often refused to take the proper doses and resorted instead to (less effective) antacids. Id., Col. 2, ll. 31-44. The inventors sought to formulate a medication that would disguise the unpalatable taste of calcium acetate and compress the medication to ease the swallowing of the dosage amount necessary for an effective treatment regime. Id., Col. 2, ll. 48-54.

Fresenius brings these suits against Paddock and Amneal, who have each filed Abbreviated New Drug Applications (ANDA) with the Food and Drug Administration (FDA), seeking approval to market generic versions of Fresenius's PhosLo gelcaps, which practice the patents-in-suit.

---

[1]Phosphate binders are compounds that bind phosphate in the stomach and intestines, helping to clear phosphorous from the body before it is absorbed into the bloodstream.

Claim Construction

Claim construction is primarily a question of law for the determination of the court. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-389 (1996). "It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004). While the specification will generally be dispositive in determining the meaning of particular claim terms, the court may also look to the prosecution history as intrinsic evidence and, as a last resort, to extrinsic evidence. See Phillips, 415 F.3d. at 1315, 1317. The patent specification "'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. at 1315, quoting Vitrionics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Because the purpose of the specification is to enable one skilled in the art to re-create the invention, see Phillips, 415 F.3d at 1323, it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." Id. at 1317. While it may not be as authoritative as the specification, the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. "The construction that stays true to the claim language and most naturally aligns with the patent's description of

the invention [in the specification] will be, in the end, the correct construction." Id. at 1316.

Claim construction "ascribes claim terms the meaning they would be given by persons of ordinary skill in the relevant art at the time of the invention." SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1283 (Fed. Cir. 2005). The court "indulge[s] a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003) (internal citations omitted).

According to Fresenius, one of ordinary skill in the relevant art (formulation and manufacture of solid oral dosage forms) would possess either a Bachelor of Science degree in pharmacy, or a Doctor of Pharmacy degree, and at least two years of post-graduate experience working on the formulation of pharmaceutical products, including solid oral dosage delivery systems.[2]

1. **"Caplet"**

Claim 1 of the '665 patent recites

[a] composition for binding phosphorous within the gastrointestinal tract of an individual, the composition comprising:

a quantity of calcium acetate sufficient to bind the phosphorous in the gastrointestinal tract of the individual,

the calcium acetate having a bulk density of between about 0.55 kg/L and about 0.75 kg/L, and

---

[2]In the alternative, Fresenius states that the person could have a Bachelor of Science degree in a discipline related to pharmacy (for example, chemistry or chemical engineering), plus at least four years of post-graduate experience working on the formulation of pharmaceutical products, including solid oral dosage delivery systems.

> **where the quantity of calcium acetate is compressed to form a caplet for fitting within a capsule in a manner which optimizes the volume of the capsule**, and
>
> where at least about 85% of said compressed calcium acetate dissolves in not more than 15 minutes when tested according to USP standard #24, test #711 at 50 to 100 RPM, apparatus 1 or 2.

'665 patent, Col. 5, ll. 31-44 (emphasis added).[3]  Claim 1 of the '445 patent recites

> [a] drug delivery vehicle for a composition for binding phosphorous within the gastrointestinal tract of an individual, the drug delivery vehicle comprising:
>
> an outer capsule defining an inner volume; and
>
> **an inner caplet comprising a quantity of calcium acetate sufficient to bind to and reduce absorption of phosphorous in the gastrointestinal tract of the individual;**
>
> the calcium acetate having a bulk density between about 0.55 kg/L and 0.75 kg/L and
>
> being compressed to a caplet form dimensioned for fitting within and optimizing the inner volume of said capsule.

'445 patent, Col. 5, ll. 41-51 (emphasis added).

> Fresenius contends that "caplet" should be construed to mean
>
> a generally oblong cohesive mass for fitting into a capsule body so that, after the capsule top is fitted onto the capsule body, the volume of the resulting finished capsule is substantially completely filled.

Paddock, on the other hand, argues that the caplet must have sufficient integrity to be "an independent dosage form."

---

[3] "USP" refers to the United States Pharmacopoeia, which is described in the specification as "a widely recognized organization that sets some of the standards that pharmaceutical manufacturers must meet to sell their drugs." '665 patent, Col. 2, ll. 12-15.

No express definition of "caplet" is provided in either of the patents-in-suit. In its background section, the '665 patent states simply that "the present invention relates to an encapsulated calcium acetate caplet," '665 patent at Col. 1, ll. 11-12, and further that "an encapsulated caplet that provides an effective dosage of medication for the treatment and management of terminal illnesses, without the risk of dosage side effects, is desired. An encapsulated caplet that also seals the taste of the medication and compresses the medication to ease or reduce the dosage volume necessary for effective illness treatment or management is desired, as well." Id., Col. 2, ll. 48-54. The patent's summary of the invention states that

> [t]he calcium acetate composition is dimensioned to form a caplet for fitting within a capsule in a manner that optimizes the volume of the capsule, i.e., fills the internal volume of the capsule substantially completely. Insertion of the **calcium acetate composition** within the capsule masks the unpleasant and unpalatable taste of the enclosed caplet.

Id., Col. 3, ll. 9-15 (emphasis added).

The dispute between the parties centers on what precisely the term "calcium acetate composition" requires - must it be simply a mass that coheres long enough to permit its insertion into the capsule, as Fresenius asserts, or must it have sufficient integrity to be delivered as an independent dosage form, as Paddock argues? On this point, the parties offer warring definitions of "caplet" and "tablet." Fresenius contends that the term is synonymous with the definition of "tablet," which is described in a "well-respected" treatise as: "a solid body that has been formed by placing it in a cavity, and applying sufficient pressure to it so 'it hangs together.'" Plaintiff's Mem. at 15, quoting J.T. Carstensen, Ph.D., *Pharmaceutical Principles of Solid Dosage Forms* 63 (1993).

For its part, Paddock argues that tablets are "'solid medicaments prepared by compaction,' and are the most commonly used independent solid dosage form." Paddock's Mem. at 14, citing Gilbert S. Banker and Christopher T. Rhodes, *Modern Pharmaceutics* 333 (3d ed. 1996).  Paddock additionally relies on the American Heritage College Dictionary 208 (3d ed. 1993), which defines "caplet" as "[a] smooth, coated, oval-shaped medicine tablet intended to be tamper resistant."  Paddock Br. at 14.  However, the only discernable similarity between this dictionary definition and the caplets claimed in the patents-in-suit is that they both contain medicine (and are perhaps oval).  Beyond that, there is no hint in the express language of the patent or the prosecution history that the caplets must be smooth.  Nor is there is any mention that they are coated, nor that they are tamper-resistant.[4]  Finally, Paddock argues that a "caplet" cannot be an oblong cohesive mass because such a mass might fall apart and become powder or granulate once placed in a capsule.  Paddock states that the caplet must be an independent dosage form in order to withstand the rigors of packaging, as stated in *Modern Pharmaceutics*, at 334.

In responding to Paddock's arguments, Fresenius maintains that the only pertinent "rigors of processing and packaging" are those involved in the insertion of the mass into a protective capsule.  Fresenius argues that any potential of the mass to disaggregate once it is encapsulated has no patent significance.  What is important to Fresenius is that the mass coheres long enough without "capping" or "picking" so that the entire dose can

---

[4]The outer capsule may be tamper-proof, but there is no similar limitation in the patents with respect to the inner caplet.

be inserted into the capsule without incident.[5]

Prosecution History

Paddock's argument is not aided in any material way by the prosecution history. During the prosecution, the patentees wrote that a caplet was "formed by placing the unit dose of the powdered medication in a cavity and applying sufficient pressure that the caplet will hang together." July 18, 2002 Remarks at 7. Fresenius contends that by construing the term to mean a "cohesive mass," it captured the concept of the calcium acetate "hang[ing] together." Fresenius further argues that the claim language defines "caplet" in functional terms; as in the sense of being "fitt[ed] within a capsule." Thus, the caplet must hang together or remain a cohesive mass only long enough to be inserted with optimal density into a capsule.

The court finds Fresenius's arguments to be persuasive. There is nothing in the intrinsic evidence to indicate that either of the patents-in-suit require that the disclosed caplet have sufficient integrity to be an independent dosage form. However, it goes without saying that to fit optimally within a capsule, the caplet must be capsule-shaped. The court therefore construes the term "caplet" as

> a capsule-shaped tablet with sufficient integrity to survive insertion into the capsule delivery vehicle.

2. **"Capsule"**

The second claim term at issue, "capsule," is disputed only insofar as the parties disagree as to whether the term imposes a dimensional limitation. Capsules are sold in

---

[5]"Capping" is the splitting along a plane parallel to the long axis of the capsule. "Picking" is the loss of small punctuate flecks of material from a surface.

various sizes ranging from #000, the largest size that can be swallowed by most patients, to #5, the smallest. While capsules sized #00 are not uncommon, they are difficult for many patients to swallow. Fresenius insists that none of the claim terms imposes a size requirement on the associated capsule. Paddock, for its part, argues that the term "capsule" must be construed as meaning capsules smaller than size #00. Paddock argues that its construction is supported by the importance given to capsule size by the applicants (that is, the capsules must be easily swallowed), as well as statements made by the applicants during the prosecution history that, in Paddock's view, disclaimed any capsules that are sized #00 or larger.

The '665 patent discloses that "[t]he present invention takes advantage of the surprising discovery that, by selecting calcium acetate raw materials within a particular range of bulk densities, it is possible to compress and dimension the raw material to form a calcium acetate caplet, capsule or tablet that is **smaller than heretofore formed** and is more easily ingested." '665 patent, Col. 3, ll. 30-35 (emphasis added).[6] The '665 patent additionally states that in using the prior art, manufacturers were "unable to produce a calcium acetate capsule or tablet of the usual dosage amount that is less than #00 in size." Id., Col. 2, ll. 25-32. The patent notes that the "unfortunate consequence" of using the #00 capsules "is that patients needing this medication, such as end stage renal disease patients have heretofore found such medications due to their bulk size difficult to swallow." Id., Col. 2, ll. 32-37.

---

[6]There does not appear to be any dispute that Fordtran, the relevant prior art, utilized #00 capsules.

9

It is true that the '665 patent offers capsules sizes #0 and #2 as the *preferred* embodiments, but not necessarily the only choices: "In one embodiment the calcium acetate is dimensioned to form a caplet for fitting within a volume defined by a #0 size capsule. . . . In another embodiment, the calcium acetate is dimensioned to form a caplet for fitting within and substantially completely filling a volume defined by a #2 size capsule." '665 patent, Col. 4, ll. 39-47. The specification additionally states: "More preferably: a narrower range of bulk density may be used to fit a 667 mg dose into a size #0 capsule or a 333.3 mg dosage into a size #2 capsule."

Fresenius argues that dependent claims 4 to 9 of the '665 patent, as well as dependent claims 7 to 12 of the '445 patent are in fact limited to "#0 size" or "#2 size" capsules. In Fresenius's view, this indicates that had Fresenius intended to place size limitations on capsules in the independent claims, it would have done so. The court notes that the specification is clear that:

> [t]he foregoing description has been directed to specific embodiments of this invention. It will be apparent, however, that other variations and modifications may be made to the described embodiments with the attainment of some or all of their advantages. Accordingly, this description should be taken only by way of example and not by way of limitation. It is the object of the appended claims to cover all such variations and modifications as come within the true spirit and scope of the invention.

'665 patent, Col. 5, ll. 15-23.

Prosecution History

Paddock argues that applicants maintained their position that size #00 capsules were "unpalatable to and disfavored by patients" throughout the patent prosecution. After the examiner rejected the initial application, applicants focused on the present invention's

utilization of calcium acetate with a range of bulk density that is compressible to "form a composition that is optimally dimensioned to fit within a #0 or #2 capsule." Jan. 28, 2002 Remarks at 7. Applicants at one point described Fordtran (the prior art) as follows:

> the dosage of calcium acetate administered by Fordtran in the study described in the '105 patent was administered in the #00 capsules that are described by applicants in the "Background" section of their application as a capsule size which is unpalatable to and disfavored by patients.

Id. After a final rejection dated May 21, 2002, the examiner held a telephone interview with applicants. In his notes summarizing the interview, the examiner stated, "Applicants more clearly explained the necessity for using their bulk density range (allowing the compression of calcium acetate in small size tablets)."

> In a further amendment following the interview, applicants stated that
>
> the gelatin capsule must be a size that can be conveniently swallowed. A dose of calcium acetate such as that disclosed by Fordtran would require at least a size #00 capsule. **This capsule is colloquially described as a horse pill. By compressing the calcium acetate to form a caplet having a size and shape that optimally fills the volume in a smaller standard capsule as recited in the independent claims, Applicants have overcome the disadvantage of the unpleasant bitter taste, while administering the dose in a more easily ingested capsule**. . . . The advantages of using a caplet in a capsule compared to untabletted powder in a capsule can be seen by comparing the size of the #0 capsule that contains a caplet with a #00 capsule that has been used to administer the calcium acetate powder. . . . Thus, forming a caplet that fits in the smaller capsule allows the dose to be presented to the patient in a much smaller, more easily swallowed dose.

July 18, 2002 Remarks at 8-9 (emphasis added).

Paddock argues that to interpret the claims to include capsule sizes #00 and larger would "materially affect the basic and novel properties of the invention." AK Steel Corp. v. Sollac, 344 F.3d 1234, 1239-1240 (Fed Cir. 2003). Paddock contends that Fresenius

11

clearly disclaimed capsules size #00 and larger to distinguish their invention from the prior art and argues that Fresenius cannot now reclaim these larger capsule sizes through claim construction litigation. L&P Prop. v. JTM, LLC, 578 F. Supp. 2d 318, 325 (D. Mass. 2008).

While the invention disclosed in the '665 and '445 patents indisputably sought a remedy to the problem of difficult-to-swallow pills, there is no clear disclaimer of the use of capsules of size #00 or greater. "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." Omega Eng'g, Inc., 334 F.3d at 1324. See also Ballard Med. Prods. v. Allegiance Healthcare Corp., 268 F.3d 1352, 1359 (Fed. Cir. 2001) ("When a patentee advises the examiner (and the public after patent issuance) that a particular structure is not within his invention, the patentee is not permitted to assert in a subsequent infringement action that the same structure is equivalent to the structure described in the patentee's specification."). A limitation based on disclaimer must, however, be shown "with reasonable clarity and deliberateness." Revolution Eyeware, Inc. v. Aspex Eyewear, Inc., 563 F.3d 1358, 1368 (Fed. Cir. 2009).

Consistent with what the record will support, the term "capsule" will be construed as meaning

> a capsule within a size range consistent with what a human patient with chronic renal failure can manipulate and swallow.

While it is the court's assumption from the parties' assertions that this construction might well include a capsule size #00, that is an issue for a jury to determine on the expert

medical evidence offered at trial.

3. **"About"**

Many of the claims describe the desired calcium acetate as having a bulk density range of between "about 0.55 kg/L and about 0.75 kg/L," while several asserted claims require that "at least about 85%" of the calcium acetate dissolve in not more than 15 minutes when tested according to a specified test protocol. There is nothing in the claims, the specification, or the prosecution history to suggest that the patentee intended to limit "about" to mean anything other than what it means in ordinary usage – to wit, "approximately".

4. **"Bulk Density"**

The final claim term at issue goes to the heart of the invention disclosed in the patents-in-suit. The '665 patent teaches that "the bulk density of calcium acetate varies according to its source. Bulk density is the density, typically of a solid, as poured or passively filled into a measurement device." '665 patent, Col. 1, l. 65 - Col. 2, l. 1.

Claim 1 discloses that the invention is achieved by

> the calcium acetate having a bulk density of between about 0.55 kg/L and about 0.75 kg/L, and where the quantity of calcium acetate is compressed to form a caplet for fitting within a capsule . . . .

'665 patent, Col. 5, ll. 36-39. While Paddock argues that the term is indefinite and incapable of construction, Amneal argues that the term must be construed as referring only to a quantity of calcium acetate that has not been modified by any "excipient(s) such as fillers, dispersants, lubricants and the like." Amneal's Post-Hr'g Mem. at 1. Fresenius rejects such a limitation, and argues that the term simply refers to the bulk density of the

13

calcium acetate composition "immediately before compression."  Fresenius's Post-Hr'g Mem. at 2.

The express language of the '665 patent could not be clearer in its support of Fresenius's proffered construction.  It states, in referring to the calcium acetate composition, that

> [a]dditional excipients, fillers, dispersants, lubricants and the like may be added to the composition of the present invention to improve its manufacture, and such modifications will be recognized as being within the[] spirit and the scope of the present invention.

'665 patent, Col. 5, ll. 24-28.

The court therefore construes bulk density as

> the mass-to-volume ratio of the calcium acetate composition immediately prior to compression, as measured by one of two methods set forth in the patent specifications.

## ORDER

The claim terms at issue will be construed for the jury and for any other purpose in this litigation in a manner consistent with the above rulings of the court.

SO ORDERED.

/s/ Richard G. Stearns

_____
United States District Judge